**IN THE COURT OF APPEALS OF IOWA**

No. 22-0894
Filed July 20, 2022

**IN THE INTEREST OF A.S. and A.M.,**
**Minor Children,**

**H.L., Mother,**
Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Daniel L. Block, Associate Juvenile Judge.

A mother appeals the termination of her parental rights to her child.

**AFFIRMED.**

Mark Milder, Denver, attorney for appellant mother.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Andrew C. Abbott of Abbott Law Office, P.C., Waterloo, attorney and guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Tabor and Badding, JJ.

**BADDING, Judge.**

In the words of the mother's attorney on appeal: "This case presents the difficult balance of legitimate child safety concerns and a parent who demonstrates a willingness to do whatever is asked of her to try to get her children home." Despite that willingness, the mother's cognitive limitations prevented her from being able to safely parent her two young children, born in 2017 and 2020. Her parental rights were accordingly terminated. The mother appeals, challenging each of the three steps in the termination framework and maintaining she should have been granted more time to work toward reunification.[1] Because the balance must favor the children's safety, we affirm.

## I.      Background Facts and Proceedings

Soon after the mother gave birth to the younger child in December 2020, hospital staff became concerned about her ability to care for him and meet his needs. Even with help from nurses, she had trouble remembering to feed the baby and didn't know what to do when he cried. The mother agreed she needed help, both with learning how to parent her infant and with her mental health. She reported that sometimes "things just go red," which led to "bouts of psychosis" in the fall of 2020 during which she became assaultive with the maternal grandmother. The mother has lived with the maternal grandmother for all but a short time in her life. Even while living with the maternal grandmother, reports were made to child-welfare services about the mother's care of the older child, who was developmentally delayed.

---

[1] The parental rights of each of the children's fathers were also terminated. Neither father appeals.

The Iowa Department of Human Services put a safety plan and family-preservation services into place "to assist the family on education and care for the children giving them extra support." As part of the safety plan, the mother agreed that the maternal grandmother would supervise her contact with the children "at all times." But the plan was soon abandoned by the family when the mother was left alone with the children while the maternal grandmother, who suffers from serious health issues, received dialysis. As a result, the State sought and obtained an order for temporary removal at the end of December, and the children were placed in foster care, where they have remained. The State also filed child-in-need-of-assistance petitions. The mother stipulated to the allegations of the petitions, and the court entered adjudications under Iowa Code section 232.2(6)(c)(2) (2020).

By April 2021, while the mother consistently attended visits with the children, a social worker found that she "continue[s] to struggle during interactions to understand what is needed for her children and to keep them safe. She continues to engage in services but little progress has been noted." In the months that followed, the mother completed a parenting class and went through two safe-care programs. Despite this parenting education, the department continued to observe that the mother "does not appear to understand basi[c] child development" and "struggles to make appointments and set up needed services for her children," who a provider described as "medically fragile."

To better understand how to help the mother reunify with her children, the department recommended that she participate in a "family centered psychological evaluation." The results of the evaluation, which was performed in September and October, were disheartening. The psychologist concluded the mother "is

significantly limited in her ability to understand and use language, to learn new information efficiently, and to be capable of concentrating and remembering over a short period of time important bits of information." The psychologist's "primary conclusion" was "that it is unlikely that [the mother] is going to be able to nurture, protect and care for her children." The psychologist added "it is highly unlikely" that the mother's "parental inadequacies" resulting from her low cognitive functioning can be remedied. So the psychologist opined the mother's unsupervised contact with the children would not be feasible.

In its November and December reports to the court, the department recommended termination proceedings. The juvenile court agreed in its January 2022 permanency order, and the State filed termination petitions in February. The mother gave birth to a third child the same month, and that child was placed in foster care as well.

At the May termination hearing, a social worker testified that despite the mother's "best efforts" since removal, "she's unable to understand what's needed to take care of her children, and . . . the children deserve to know where they're going to grow up." The worker opined the children would be in "imminent danger" if returned to the mother's custody. A visitation supervisor did note in a report that after more than a year of services, the mother had "mastered" a routine for her two-hour supervised visits. But the provider testified the mother was not yet ready for full-time care of her children, explaining: "[H]er supervising the kids with two other adults there for two hours is a very different thing than having them there 24 hours a day seven days a week."

In its termination order, the court found the mother

> has shown brief improvements on her parenting skills during
> supervised visits. However, [the mother] has been unable to
> demonstrate the necessary skills from visit to visit. . . .
>     The children have been removed from the care of [the mother]
> for nearly eighteen months. The concerns which led to the children's
> removal continue to exist today. The inability of [the mother] to
> consistently demonstrate basic parenting skills remains a chronic
> issue. Supervision concerns continue to exist even during
> supervised visits.

The court accordingly concluded that if the children were returned to the mother, they "would be placed at imminent risk of further abuse or neglect." Finding no reason to believe the situation would change if the mother was given more time, the court terminated the mother's parental rights.

## II.    Analysis

We apply a three-step analysis in conducting our de novo review of terminations of parental rights, asking whether (1) a statutory ground for termination is satisfied, (2) the children's best interests are served by termination, and (3) a statutory exception applies and should be exercised to preclude termination. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022) (noting that in conducting our de novo review, we "give weight to the [court's] factual findings but are not bound by them"); *see also* Iowa Code § 232.116(1)–(3) (2021). If all three steps support termination, we consider the ancillary issues raised by the parent, such as whether additional time should be granted. *See* Iowa Code § 232.117(5); *see also id.* § 232.104(2)(b).

### A.     Grounds for Termination

The juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(f) and (h).[2]  These provisions apply to the children separately based on their ages.  *See* Iowa Code § 232.116(1)(f)(1), (h)(1).  The mother only challenges the State's establishment of the final element of each ground—that the children could not be returned to her care at the time of the termination hearing.  *See id.* § 232.116(1)(f)(4), (h)(4); *see also D.W.*, 791 N.W.2d at 707 (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing").

The mother highlights her legitimate efforts to learn the skills necessary to parent her children despite her cognitive issues.  She also submits that she was never given a meaningful chance at reunification by showing her parenting abilities through visitation with less supervision.[3]  We commend the mother for her efforts.

---

[2] The termination ruling also ordered termination of the mother's rights under paragraph (e).  It appears the inclusion of that ground for termination was in error, as the court provided no substantive analysis under that ground, while it did for the others.  Whether inclusion of paragraph (e) was intended or not, "we may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence."  We choose to limit our review to termination under paragraphs (f) and (h).  *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010).

[3] Though the phrase is not mentioned in her appellate brief, the mother's argument is really just a reasonable-efforts challenge.  *See* Iowa Code § 232.102(10)(a) ("'[R]easonable efforts' means the efforts made to . . . make it possible for the child to safely return to the family's home.").  While the State argues she did not preserve error on this challenge, the mother did ask for semi-supervised or unsupervised visitation in the hearings that took place before the termination hearing.  *Cf. In re L.M.*, 904 N.W.2d 835, 840 (Iowa 2017) ("In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding.").  Those requests were denied by the juvenile court.  Although we could find the mother's challenge waived because of her failure to cite supporting legal authority, *see* Iowa R. App. P. 6.903(2)(g)(3), we believe the State's efforts were reasonable considering the need to ensure the children's safety as detailed above.  *See* Iowa Code § 232.102(10)(a) ("A child's

The trouble is, while she could show "routine" and "basic parenting" skills during supervised visits, the mother's performance of those skills still required prompting. None of the professionals involved in the case, including the visitation supervisor who testified on the mother's behalf, believed the mother was ready for unsupervised care of the children. And the psychologist strongly recommended against it, even stating that "the nature of supervision necessary for [the mother] to keep her children safe must be such so as to ensure that she is never left alone with the children and that she be constantly coached about detailed behaviors regarding interactions with the children."

The mother herself acknowledges her ability to manage "things that come up out of routine" during interactions "is a legitimate concern." While she argues the maternal grandmother and other relatives could step in to facilitate visits, the maternal grandmother had failed to follow visitation guidelines under a safety plan in the past. And the record shows the other relatives are no longer interested in being involved with visits.

Because of the mother's inability to provide minimally adequate care, she was not in a situation to progress beyond fully supervised visits and, by extension, could not resume care of the children. In reaching this conclusion, we acknowledge the mother's parenting deficits stem from her low mental functioning, which alone is not enough to terminate her parental rights. *See In re A.W.*, 843 N.W.2d 100, 111 (Iowa 2014). But it is a proper factor to consider when, as here,

---

health and safety shall be the paramount concern in making reasonable efforts."); *L.M.*, 904 N.W.2d at 839 ("If services directed at removing the risk or danger responsible for a limited visitation scheme have failed its objective, increased visitation would most likely not be in the child's best interests." (citation omitted)).

it contributes to the mother's inability to parent. *See id.* On our de novo review, we agree with the district court that the children could not be returned to the mother's care at the time of the termination hearing.

## B. Best Interests

In a related argument, the mother asserts it is not in the children's best interests to order termination without providing her "a full chance to demonstrate parenting in a less than fully supervised setting." But, as noted, that was not a viable option at the time of the termination hearing. And in determining whether termination is in the best interests of a child, we focus on "the child's safety," "the best placement for furthering the long-term nurturing and growth of the child," and "the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). The defining elements of a child's best interests are safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

The mother's inability to provide minimally adequate parenting to the children continues to present serious safety concerns. *See In re K.F.*, 437 N.W.2d 559, 560 (Iowa 1989) (noting that when a mental disability "contributes to a person's inability to parent," that factor "may be determinative on the issue of whether termination is required in the child's best interest"). Having been hanging in limbo for roughly a year and a half at the time of the termination hearing, these children's best interests mandate stability and permanency now. By all accounts, the mother loved her children and tried her best to learn how to safely parent them. But unfortunately, her best efforts simply weren't enough. As our supreme court has explained:

There are a number of stern realities faced by a juvenile judge in any case of this kind. Among the most important is the relentless passage of precious time. The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems. Neither will childhood await the wanderings of judicial process. The child will continue to grow, either in bad or unsettled conditions or in the improved and permanent shelter which ideally, at least, follows the conclusion of a juvenile proceeding.

The law nevertheless demands a full measure of patience with troubled parents who attempt to remedy a lack of parenting skills. In view of this required patience, certain steps are prescribed when termination of the parent-child relationship is undertaken under Iowa Code chapter 232. But, beyond the parameters of chapter 232, patience with parents can soon translate into intolerable hardship for their children.

*In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987). We agree with the district court that the children's best interests are served by termination.

### C. Statutory Exception

We interpret a portion of the mother's best-interests argument to request application of the statutory exception to termination in Iowa Code section 232.116(3)(c), which authorizes the court to forgo termination when it "would be detrimental to the child[ren] . . . due to the closeness of the parent-child relationship." We first note the application of a statutory exception to termination, if one exists, is "permissive, not mandatory." *In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (quoting *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014)). And "the parent resisting termination bears the burden to establish an exception." *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). Though the mother asserts she was bonded to the children, she acknowledges the bonds were "not as evident from the children's perspective." The record confirms her acknowledgment. The mother presented no evidence the children would suffer physical, mental, or emotional

detriment if her rights were terminated. As a result, we conclude this exception to termination does not apply.

### D. Additional Time

Threaded throughout the mother's arguments on appeal is her desire for more time to work toward reunification. *See* Iowa Code §§ 232.117(5) (stating that if the juvenile court does not terminate parental rights, it may enter an order under section 232.104(2)(b)), .104(2)(b) (allowing the juvenile court to continue placement of a child for an additional six months). She argues "[a] little more time could have gone a long way" toward further improving her skills through parenting classes and guidance from family centered service providers during interactions. But by the time of the termination hearing, the mother had been participating in those services for more than a year with no meaningful progress. *See id.* § 232.104(2)(b) (stating a six-month extension is appropriate if the parent can establish that "the need for removal . . . will no longer exist at the end of the additional six-month period"); *accord In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021). So we cannot agree that giving her more time would lead to a different result. *See In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998) ("[A] good prediction of the future conduct of a parent is to look at the past conduct.").

### III. Conclusion

We affirm the termination of the mother's parental rights.

**AFFIRMED.**